[Civ. No. 12594. Third Dist. Jan. 20, 1971.]

JACK HALPIN et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
DOUGLAS GUARDIAN WAREHOUSE, Real Party in Interest.

[Civ. No. 12606. Third Dist. Jan. 20, 1971.]

HYSTER COMPANY, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
JACK HALPIN et al., Real Parties in Interest.

[Consolidated Cases.]

## COUNSEL

Fitzwilliam, Memering, Stumbos & DeMers, Louis A. DeMers, Bledsoe, Smith, Cathcart, Johnson & Rogers and Roger Smith for Petitioners and for Real Parties in Interest in No. 12606.

No appearance for Respondent.

Rust & Mills, Horvitz & Minikes, Ellis J. Horvitz and William Mayhew for Real Parties in Interest in No. 12594.

## OPINION

**PIERCE, P. J.**—We issued an order to show cause and a stay order on the two above-captioned petitions for mandamus and/or prohibition. The Halpin-Giles petition represents interests antipodal to the Hyster Company ("Hyster") petition but the aim of both was to stay further proceedings in an action pending in the Superior Court of Sacramento County, No. 192553 ("Sacramento action") entitled Douglas Guardian Warehouse ("Warehouse") v. Jack Halpin and Max G. Giles.

The two proceedings have been consolidated. The declared purpose of the Sacramento action was to compel specific performance of an alleged settlement between plaintiff Warehouse, represented by attorney Rust and his firm, on the one hand, and defendant Giles, represented by attorney Halpin (who was also a defendant), on the other hand. The alleged settlement was of a cause of action for personal injuries brought in the Shasta County Superior Court ("Shasta action") by Giles against three defendants of which Warehouse was one and Hyster was another. The trial had been birfucated. The liability phase was in progress at the time the claimed settlement was said to have been made. Judge Abbe was sitting without a jury to determine the liability of the three defendants. During the progress of this phase Judge Abbe was told of negotiations for a settlement which apparently would be effected between all parties but that an actual settlement had not been consummated. We will explain these negotiations at some length below. The judge recessed the trial for five days.

On the day to which the trial had been continued its progress was resumed. The proposed settlement had been abortive. The reasons for its failure will also be described. All parties were present represented by counsel—including Warehouse represented by Mr. Rust. Outside of court there had been a dispute between Mr. Rust and Mr. Halpin as to whether a settlement between Giles and Warehouse had actually occurred. Judge Abbe was not informed by Mr. Rust or anyone else, either of a completed settlement or of any dispute.

The liability phase of the trial continued as though there had been no interruption. Mr. Rust, with the others, participated in it until its termination. The issue of a settlement was not raised. A determination was made by Judge Abbe that two defendants, Hyster and Warehouse, were liable as joint tortfeasors. Even when that decision was made there was no claim by Mr. Rust of any settlement.

Meanwhile, the damage phase of the trial was set to be heard before a jury in the Shasta action. That was the posture of the case when the Sacramento action was filed.

The verified complaint filed by Warehouse in the Sacramento action alleged a separate good faith settlement solely between plaintiff Giles and Warehouse. Both Giles and Halpin were named as defendants and, as stated, they were the only defendants. It was *not* alleged that Mr. Rust, representing Warehouse, had participated in that phase of the trial. On the contrary, it was falsely alleged that the court in the Shasta action had been informed of the settlement and that the court had "excused" Warehouse and Mr. Rust from further participation in the trial. (It was not explained how the court nevertheless thereafter found Warehouse liable with Hyster as joint tortfeasor.) The complaint prayed for specific performance of the alleged agreement and for an injunction to be issued against defendants prohibiting them from further participation in the Shasta action against Warehouse.

There is another curious circumstance which we will advert to in greater depth below. Before Giles and/or Halpin appeared in the Sacramento action an agreement in writing between Halpin and Rust had been secretly reached respecting a possible limit to be given any judgment which might be rendered in the Sacramento action in favor of Warehouse and against Giles and Halpin.

Nevertheless, under the state of affairs described above, the Sacramento County Superior Court assumed jurisdiction. Also, after a hearing lasting less than two hours which, it was stipulated by the parties, was to be a trial on the merits, *except that it was not necessarily to be binding,* the court issued an injunction enjoining Giles and Halpin from further participation in the Shasta action as against Warehouse.

We will explain below the events which followed this strange maneuvering. It will be sufficient to say here that the Shasta action proceeded through the damage phase and to judgment (more or less at the telephoned suggestion of the Sacramento County Superior Court judge), tentative findings against Giles and Halpin were prepared in the Sacramento action, defendant Hyster of the Shasta action sought to appear specially to attack the jurisdiction of the Sacramento County Superior Court, objections to the findings were filed by Giles and Halpin, hearings were held in December 1969. In February 1970 the Sacramento County Superior Court decided that Hyster was not entitled to any hearing on the validity of a settlement to which the court nevertheless found Hyster to have been a party, and the Sacramento court signed findings (outside the issues framed by the pleadings). At that point these proceedings were brought.

The facts stated above require that a peremptory writ issue. This court believes, however, that those facts should be augmented so that the reasons for the rulings hereinafter to be made will be clarified.

## The Facts Augmented

When this court, after an initial study of the written presentation of the parties and after hearing the oral argument, commenced to study the materials before it and the transcription of the oral argument, it found hopeless contradictions between representations made by the several parties. It therefore asked explanation. Five supplementary letter briefs and five separate affidavits (or declarations under penalty of perjury) were submitted. The affidavits (although clarifying certain matters as to which this court had gained a misunderstanding) are not only contradictory as between the parties, one of them is self-contradictory. On the record before us we are critical of behavior of certain counsel as officers of the court. We will, however, in the main, let the facts speak for themselves and we shall attempt to give as concise an account as the nature of this matter will permit.

*January 25, 1968.* Max G. Giles, represented by Halpin as attorney, filed as plaintiff a complaint in the Shasta County Superior Court naming Warehouse, Plywood Redding, Inc., and a number of Doe defendants of which Hyster was later served as one. Giles sought $500,000 in damages for injuries suffered while operating a forklift manufactured and owned by Hyster and leased to Gold-Rey Plywood Sales, Inc. The latter was Giles' employer. Gold-Rey (not a defendant) filed a complaint in intervention. The status of Plywood Redding, Inc., is unimportant.

*March 11, 1969.* The trial of the liability phase of the trial (theretofore ordered to be bifurcated) was commenced before Judge Abbe sitting without a jury.

*Friday, March 14, 1969.* It was declared in open court that a tentative settlement agreement had been reached. We have the transcript of the court proceedings on that day before us. These proceedings do not, as attorney Rust now insists, show or indicate any completed settlement of Giles with Warehouse or of Giles with anyone else. They do show that attorney Halpin stated, "we think we have got the case settled, but there are some technicalities to worry over. . . ." There is a statement: "Mr. Rust: . . . it will not be necessary for me to be back here" and thereafter there was a colloquy between court and counsel to the effect that *should the tentative settlement be concluded no one would have to come back.* The tenor of the whole discussion, however, was that the actual settlement was tentative and the court ordered a recess with the trial to be continued in the event it failed.

*March 13-19, 1969.* There are varying accounts of what happened during the settlement negotiations. (It should be noted here—out of chronological order—that later a member of Mr. Rust's firm was to propose, and ultimately the Sacramento County Superior Court was to find, that the

actual settlement entered into was one between Giles on the one hand and ALL defendants, plus the complainant in intervention.)

Attorney George Littlefield was the attorney representing Gold-Rey's compensation carrier, Employer's Mutual Liability Insurance Company of Wisconsin ("Employer's Mutual"). In the proceedings now before us a declaration was solicited from him by *both Mr. Rust* and Mr. Halpin as to Littlefield's version of what had taken place during settlement negotiations after the court recessed and before it reconvened. He has filed this declaration dated October 23, 1970. It shows in relevant part that Littlefield had received authority from Employer's Mutual and Gold-Rey to contribute $50,000 to a " 'package settlement' " offer by Mr. Halpin to settle the case for $225,000. Gold-Rey's contribution was conditioned upon approval by the Workmen's Compensation Appeals Board. Hyster, represented by Mr. Smith, agreed to contribute $125,000. Warehouse, insured by Liberty Mutual, had agreed to contribute $25,000. Although this left the total $25,000 short of the demand, Mr. Halpin said he would be willing to reduce the demand to $200,000 and would discuss it with Mr. and Mrs. Giles. Hyster's contribution was conditioned upon Mrs. Giles' approval and signature upon the release. The reason: both Mr. and Mrs. Giles had been present (off-stage) during negotiations. Giles had been rendered a paraplegic in the accident which was the subject of the action. Mr. Smith (and presumably others) had learned that Mrs. Giles contemplated a dissolution of the marriage. She demanded a part of the settlement moneys. Although a personal injury recovery is ordinarily separate property, the foregoing facts make Mr. Smith's condition a reasonable one. As Mr. Smith expressed it, he did not want his client to suffer substitution of one lawsuit for another. Because the condition could not be met the settlement failed.

Mr. Littlefield's declaration continues: "Thereafter, Mr. Challoner [an insurance company representative], Mr. Halpin, and I proceeded to lunch where we met with Mr. Rust. Mr. Rust was informed by Mr. Halpin and by me that the settlement had 'blown up'." Mr. John Quincy Brown [who represented defendant Plywood Redding, Inc., the third (non-paying) defendant] was also advised as to what had happened.

*"At no time was I led to believe, nor did I believe that Mr. Halpin had offered a piecemeal settlement. In fact, my offer to settle in the sum of $50,000.00 on behalf of my client, was contingent upon the total sum of settlement being accepted as a third party compromise and release before the Workmen's Compensation Appeal [sic] Board."* (Italics ours.)

In one part of Mr. Rust's declaration he confirmed the information that

he had received *on March 14, 1969,* and the stated reason for it—"because Mr. Giles' wife had threatened divorce and might or would demand part of the settlement." Seemingly inconsistent is his later statement in the same declaration: "It was only after I filed suit in the present action [*filed May 14, 1969*] that I learned for the first time that the Giles-Hyster settlement blew up because Hyster had insisted upon Mrs. Giles' signature, . . ."

Halpin's declaration reiterates the statement made by Littlefield that all settlement proposals were for a " 'package settlement'." Halpin also adds a contention that settlement negotiations had "broken down" within one hour after the March 14, 1969, court recess and that Rust was immediately so advised. *Rust had not informed him then of any claim that he considered the settlement binding.* That contention was not made until just prior to the commencement of the renewed (liability) hearing on March 19, 1969. Halpin had replied that he had not negotiated with any defendant individually and repeated his statement that it was a " 'package settlement.' "

*The trial judge was not advised that there was any contention by Rust that "he had a valid settlement,* and to my [Halpin's] knowledge, Mr. Rust did not advise Judge Abbe that he [Rust] felt that he had a valid settlement before the decision on the liability." (Italics ours.) *This is not disputed by Rust. Nor does Mr. Rust contend that he told Hyster's attorneys of any settlement contention.*

*March 19-26, 1969.* The case continued on to decision. Rust participated in the liability phase of the trial. On March 26, 1969, Judge Abbe filed his decision. He ruled in favor of Giles and against Hyster and Warehouse and declared that the negligence of each was equal. He ruled in favor of Plywood Redding, Inc., dismissing the case as to it with costs. On the issue raised by complainant in intervention, the employer, Gold-Rey, the court found that it was negligent ". . . and its negligence was a proximate cause of plaintiff's injuries." The damage phase of the bifurcated trial was set for July 1, 1969.

*April 7, 1969.* Rust wrote a letter to Halpin. In it he said, "I am absolutely totally amazed at the [Shasta County court's] decision, because, frankly, it makes absolutely no sense at all." [Why then Warehouse's $25,000 settlement offer?] Also stated in the letter is the following: "In the light of all this, I have advised my clients that rather than proceed with the enforcement of the settlement, they ought to simply bide their time and then take an appeal. . . ." He proceeded to state that his client had insisted that Rust try to enforce the settlement. Also, he said, in spite of a 20-year-long friendship with Halpin, he was going to join him as a defendant. He suggested, however, that if the action were to be brought in Shasta County it might affect the size of any verdict "against Hyster and/or

anyone" ("and/or anyone" meant, of course, Warehouse which was the only defendant then remaining in the case besides Hyster). Rust's declaration continues: "This, of course, could seriously prejudice Giles' case with respect to obtaining the ultimate judgment. *In order to avoid all of that I would be willing to file the law suit here in Sacramento County. . . .*"[1] (Italics ours.)

*May 14, 1969.* Warehouse, through Rust's firm as attorneys, filed an action against Giles and Halpin contending a separate, severable settlement of the Shasta action between Giles and Warehouse for $25,000 in "good faith."

The complaint further alleged: "After the case had been settled as to the plaintiff herein, the settlement was announced to the trial court in open Court and the plaintiff was excused from any further participation in Action # 37153 [the Shasta action]." The complaint was verified and the statement just quoted was, as this recital of facts above has shown, blatantly and blandly untrue.

Noticeably omitted from the complaint is any concession that there had been no settlement between Giles and Hyster. Also omitted is the fact that Mr. Rust for Warehouse had continued to participate in the Shasta liability trial.

*June 16, 1969.* Rust wrote another letter to Halpin. The letter states in relevant part: "In light of our discussions wherein you agreed to have the matter heard on the merits on the order to show cause, I hereby agree that in the event that Judge Schaber[2] rules in our favor, and that subsequent thereto on the trial of the [Shasta] action . . . the trial court rules that the holding of Judge Schaber is not binding . . . *I will immediately stipulate to set aside Judge Schaber's judgment* with the understanding, however, that we could then re-try the issue of whether or not our settlement was entered into in good faith." In a second paragraph it is stated, "The purpose of this stipulation is to protect you and your client from having one Court rule that the settlement was entered into in good faith and another Court rule adversely. . . ." (Italics ours.)

On the same date Halpin made a general appearance in the Sacramento

---

[1]We have read this letter with some amazement. It is the first instance in the experience of this court that an attorney representing a defendant which had already been found to be a joint tortfeasor but as to whom (and its fellow tortfeasor) no damages had been fixed by a jury has ever expressed a wish, by moving into another county, to keep facts from the jury which would be calculated to keep damages assessed against his client down.

[2]It had been anticipated that Judge Schaber would be the Sacramento trial judge. When the hearing took place Judge Schaber was not available and another judge was substituted in his place.

action by filing a denial of all allegations. It is conceded that, as far as the parties to the Sacramento action were concerned, the hearing on the preliminary injunction was to be deemed a hearing on the merits.

*June 30, 1969.* The Sacramento action was heard. Neither Hyster nor its attorneys had any notice, or knowledge, of the proceedings. There was no court reporter present. Only the declarations (from which we have quoted liberally above) are before us. The hearing lasted less than two hours. The court, on the basis of such evidence, issued a preliminary injunction as prayed for.

*July 1, 1969.* The jury was called for the commencement of the damage phase of the Shasta action. That morning Judge Abbe received a copy of the preliminary injunction. He telephoned to the judge in the Sacramento action who had issued the injunction. Following is an excerpt of the Sacramento Superior Court's statement of that conversation:

"THE COURT: . . . Judge Abbey [*sic*] called me and he said, 'One of Mr. Rust's associates is here. What shall I do? Shall he participate in the case or shouldn't he participate in the case? What should I do?'

"I know Judge Abbey [*sic*] and I said, 'Well, Judge Abbey [*sic*], if I were in your position I would say you participate in the trial of this case because I am not infallible. I may be wrong. You know, indeed, I may well be wrong, and I just don't want to see your case tried and then have to be retried by virtue of a mistake that I may have made. So I think that you are going to be saving time in the long run to allow this fellow to participate in the trial.' "

*December 3, 1969.* From the time that the negotiations for settlement had failed on March 14, 1969, until the preliminary injunction had been served on July 1, 1969, neither Hyster nor its attorneys had had any information (1) of Rust's contention that there had been an executed settlement between Warehouse and Giles, or (2) that the Sacramento action (in which Hyster had not been made a party or served) had been brought. On December 3 Hyster appeared specially in the Sacramento action to contest jurisdiction.

*December 8, 1969.* Giles and Halpin filed a notice of motion for an order of dismissal, with a notice of motion for a change of venue to Shasta County, or in the further alternative, a motion to reopen the evidence and take new testimony. Since there had been a stipulation (between Rust and Halpin) that the evidence taken on June 30, 1969, would be considered to have been on the merits, proposed findings of fact had been prepared and objections thereto had been filed.

*December 12, 1969.* Hearings on all matters described in the preceding paragraph were held in the Sacramento action.

Meanwhile: *July 1-8, 1969.* The damages phase of the Shasta action was held before the court sitting with a jury. The jury assessed plaintiff's damages at $410,000. Halpin appeared. Thomas Tweedy of the firm of Rust, Hoffman and Mills appeared for Warehouse; Roger Smith of Bledsoe, Smith, Cathcart, Johnson and Rogers appeared for Hyster.

*September 16, 1969.* After proposed findings had been filed and objections made thereto in the Shasta action, the findings were settled and filed. On the same date judgment was entered in favor of Giles and against Hyster and Warehouse for $383,233.81 ($410,000 less $26,766.19), the amount of compensation which had been paid to July 1, 1969.

*September 19, 1969.* A notice of motion for a new trial was filed on behalf of Hyster.

*September 29, 1969.* A notice of motion for a new trial was filed on behalf of Warehouse.

*November 14, 1969.* The motions for a new trial were denied.

*December 3, 1969.* Warehouse filed a notice of appeal.

*December 10, 1969.* Hyster filed a notice of appeal.

These appeals are still pending. Meanwhile, the following proceedings were being held in the Sacramento action:

*February 27, 1970.* The court in the Sacramento action denied all of the motions and adopted the proposed findings which had been prepared by Thomas Tweedy, a partner of Rust. This court has carefully compared these findings with the pleadings in the Sacramento action. Although Warehouse had alleged in its complaint and in the several declarations of its attorney, Rust, had maintained and still maintains that it had a separate settlement with Giles not depending upon nor a part of any settlement negotiations between Giles on the one hand, and Hyster or Gold-Rey on the other,[3] the Tweedy findings adopted by the court find that "there was a contract of settlement and compromise between plaintiff and defendants DOUGLAS-GUARDIAN WAREHOUSE, HYSTER CORPORATION, and intervenor GOLD REY PLYWOODS SALES, INC. in the amount of TWO HUNDRED THOUSAND DOLLARS ($200,000.00) entered into in good faith and for valuable con-

---

[3]During the colloquy between the court in the Sacramento County action and counsel on December 12, 1969, Mr. Rust had said: "I didn't have the vaguest notion what really happened [in the negotiations between Halpin and the attorneys for Hyster and Gold-Rey] . . . so far as my rights were concerned."

sideration by all parties. . . . It is further found that after the offers of settlement and compromise had been accepted and, accordingly, a contract relationship had been created, defendant HYSTER CORPORATION was allowed to withdraw by plaintiff because of reservations said defendants' counsel, JACK HALPIN, and HYSTER CORPORATION had with respect to the obtaining of plaintiff's wife's release and the possibility of further litigation."

Both Mr. Halpin and Mr. Rust indignantly deny any collusion between them. Each has a reputation for vigorous advocacy in the interests of his clients. No member of this court suspects that the court-shopping adventure had anything to do with a sell-out of a client. The two attorneys were on opposite sides of litigation, however, and while Mr. Halpin may well have been willing to have litigation regarding an alleged settlement between Giles and Warehouse for $25,000 tried in a jurisdiction other than the one where larger damages would be asked from a jury (particularly when Mr. Halpin was protected by the letter from Mr. Rust dated June 16, 1969, which transformed the Sacramento action into a possibly moot proceeding), the reason's for Mr. Rust's altruism as stated in his letter of April 7, 1969, are not so clear. (See fn. 1.) We think the position which Mr. Smith takes in this respect may be more believable—that Mr. Rust was eager that Warehouse be able to shed the haircloth of a joint tortfeasor liable with Hyster to pay an equal or equitable share of a verdict thereafter to be fixed in the sum of $383,234 and don belatedly instead the mantle of a settler of litigation entitled to a dismissal (at a saving of $166,617).

### INADEQUACY OF FINDINGS

The complaint in Sacramento County had, as stated, alleged a separate, severable contract of settlement solely between Giles and Warehouse in which neither Hyster nor intervener Gold-Rey had participated. The findings signed by the court do not conform to the pleadings. They were based upon proposed findings prepared by Mr. Tweedy, a partner of Mr. Rust. They were objected to presumably upon the grounds they are not within the issues framed by the pleadings and also because they are not true. Mr. Tweedy has explained their preparation in a declaration filed with the court. He attests that *his* draft had been prepared with a few changes from a draft prepared by the judge in the Sacramento action. The judge had been impatient with the delay in preparation and had instructed Mr. Tweedy "to draft the Findings in accordance with his thinking as reflected in his draft." That draft as submitted (and amended by Tweedy) is attached to his declaration. We have compared the rough draft with the original. They are quite similar. Both the court and the attorney treat the negotiations and settlement as one "contract" with no unfulfilled conditions precedent or subsequent, a simple offer by Halpin for Giles and acceptance *by Hyster,*

*Gold-Rey and Warehouse.* This contract is treated as if all of the parties, including Warehouse, were privy to all negotiations. That is quite different from the facts as alleged in the complaint which we have outlined, including the representations of Mr. Rust to the court that he did not have "the vaguest notion" of what had transpired in the negotiations by Mr. Halpin with the attorneys for the other parties.

We have noted above that the requirement by Mr. Smith that Mrs. Giles sign the settlement agreement before he would commit his client, Hyster, to pay out $125,000, was "understandable." It was also reasonable. Although Mrs. Giles was neither an actual nor an indispensable party to the Shasta action, she was, once she had disclosed, (1) an impending divorce, (2) that she was going to demand a portion of the settlement moneys and (3) had put the largest—and perhaps all—of the parties to that settlement on notice of her claim, a significant party to the settlement. Anyone paying large sums of money to her husband under those circumstances would be very unwise indeed, and any lawyer who would not advise his client, as Mr. Smith had done, that he would probably be settling one lawsuit only to face another, would be guilty of giving extremely bad advice.

There was, therefore, *not* the simple offer and acceptance with a clear "meeting of the minds" which the court in the Sacramento action seems to feel, after a very brief hearing, was here involved. The question of when and under what circumstances a mutual assent occurs is (despite its fundamental nature in contract law) an exceedingly complex one. (See, e.g., 1 Witkin, Summary of Cal. Law, Contracts, § 30 et seq., p. 39 et seq.) This opinion need not analyze those complexities. ■ It is sufficient to say that the complaint had pleaded a separate contract between *two* parties and that the court found a different contract between *four* parties (two of whom were not before the court, one of those two not being permitted to participate in the proceedings).

### THE EFFECT OF CALIFORNIA'S JOINT TORTFEASOR CONTRIBUTION STATUTE.

The Legislature in 1957 (Stats. 1957, ch. 1700) adopted the Releases From and Contribution Among Joint Tortfeasors statute. (Code Civ. Proc., §§ 875-880.) These sections provide in material part and in effect that where a money judgment has been rendered jointly against two or more defendants in a tort action there shall be a right of contribution among them (§ 875, subd. (a)) *to be administered in accordance with the principles of equity* (§ 875, subd. (b)). Such right of contribution may be enforced only after one tortfeasor has, by payment, discharged the joint judgment or has paid more than his pro rata share thereof—in which case

the right of contribution shall be limited to the excess (§ 875, subd. (c)). "Pro rata" is to be determined by dividing the judgment equally among all of them (§ 876, subd. (a)). Section 877 provides for a release from such liability where a release, dismissal or covenant not to sue has been "given in good faith *before verdict or judgment* to one or more of a number of tortfeasors *claimed* to be liable for the same tort."[4] (Italics ours.)

The contribution statute takes consideration of issues arising both before and after liability and damages have been established. It does not expressly discuss the bifurcated trial with situations which will arise after liability has been established but before damages have been assessed. ■ We have no doubt, however, that the Legislature intended by the statute a comprehensive scheme of contribution between joint tortfeasors (after they have been judicially declared to be such) and intended that scheme to be operative in a bifurcated trial situation as well as in the conventional single trial.

■ Of the contribution statute provisions, Code of Civil Procedure section 877 is particularly apposite, and the following conclusions inevitably flow from the legislative language: that after a determination of joint tortfeasor liability no defendant is one against whom there is a mere "claim of liability." Liability has become established. Secondly, the words of the section "before verdict or judgment" must be construed to mean: "before establishment of liability," with "verdict" equated with such liability determination. A settlement between the plaintiff and a tortfeasor whose joint liability has been established is not one within the meaning of that section, and thus cannot effectively deprive the remaining tortfeasors of their rights to contribution.

A principal reason why that interpretation seems inevitable is this: were the rule to be established otherwise, there would unquestionably occur concurrently with the determination of joint liability a mad rush by one or more of the joint tortfeasors in an effort to settle and to obtain a release, thus thwarting the provisions of the contribution statute and the right of the other joint tortfeasors to obtain contribution from the settlers. A complete breakdown of (1) bifurcation of trials and (2) the operation of the contribution statute's provisions would follow. Both of these modern processes are notably progressive advances towards the more efficient disposition of litigation.

---

[4]Section 877 goes on to provide: "(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

"(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

Nothing herein contained is intended to, or should be, construed to hinder settlement and termination of litigation between plaintiffs and individual defendants *inter sese,* or settlements and termination of lawsuits between plaintiffs and some but not all defendants before liability among joint tort-feasors has been determined. But once such liability *has* been determined against all defendants jointly liable, then the provisions of the contribution statute within the obvious interest of the Legislature must be heeded.[5]

■ Since the contribution statute, and particularly section 877 thereof, is applicable, all defendants had become " 'persons whose interests, rights, or duties will inevitably be affected by any decree which can be rendered in the action' " must be joined, and the failure to obtain personal jurisdiction over such parties deprives the court of subject matter jurisdiction. It has been said, "The court . . . cannot even proceed as to . . . [parties over whom it has personal jurisdiction] unless the absent parties are brought in. . . ." (1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 66, p. 588, and see cases there cited; Code Civ. Proc., § 389.)

The rule cuts deeper than the findings made by the court in the Sacramento action. It would prevent any findings by that court.

### The Effect of One Superior Court Snatching Jurisdiction From Another Which Already Had Jurisdiction Over Both Subject Matter and All Parties and Which Is In Midtrial

Under this caption we will discuss the question of the jurisdiction of the court in the Sacramento action *wholly regardless of the provisions of the contribution statute.*

■ At the time Warehouse induced the court in Sacramento to assume jurisdiction in an action by one of the parties to the Shasta action, Warehouse, against another, Giles,[6] both parties were midway in the trial of

---

[5]*Thornton* v. *Luce* (1962) 209 Cal.App.2d 542, 550-552 [26 Cal.Rptr. 393] (hear. den.), held that no right to contribution exists prior to entry of a joint money judgment. The case is distinguishable. It involved a single trial at which both liability and damages were to be determined. The settlement therein was executed prior to either verdict or judgment. The court relied on the absence of an adjudication of the *"common liability"* (original italics) which the right to contribution presupposes and noted that "potential liability" as joint tortfeasors is an insufficient basis for removing from a plaintiff the right to control his case. Actually the reasoning of the *Thornton* case, when applied to the facts of the case at bench, supports the conclusion of this court that once the existence of joint liability has been found, the inchoate rights to contribution among those responsible may not be terminated by the plaintiff acting in concert with less than all such defendants.

[6]Halpin was neither an indispensable nor a proper party. There was no conflict of interest between Halpin and his client, Giles. If a contract had existed, it was Giles' contract, not Halpin's. Halpin had never stepped beyond his role as an attorney.

the latter action. The Shasta County Superior Court had both subject matter jurisdiction and jurisdiction in personam. In all of the arguments which have been made herein it has never been contended that Warehouse could not have raised the same contentions in Shasta County that were raised in Sacramento. The only asserted reason for attempting to take the issue away from Shasta County was a belief (shared or unshared between the attorneys concerned—it makes no difference) that at that stage factors extraneous to *any* issue to be tried could conceivably affect the jury's generosity. Fortunately for the orderly administration of justice, that is not a valid reason to interrupt a trial.

The rule is settled that even when two superior courts have concurrent jurisdiction over the subject matter and parties involved in litigation, the first to assume jurisdiction has exclusive and continuing jurisdiction over the subject matter and all parties involved until such time as all necessarily related matters have been resolved. (*Stearns* v. *Los Angeles City School Dist.* (1966) 244 Cal.App.2d 696, 708-716 [53 Cal.Rptr. 482]; *Cade* v. *Superior Court* (1961) 191 Cal.App.2d 554, 559 [12 Cal.Rptr. 847]; *M. H. Golden etc. Co.* v. *Superior Court* (1950) 98 Cal.App.2d 811, 815-816 [221 P.2d 218]; *Myers* v. *Superior Court* (1946) 75 Cal.App.2d 925-929 [172 P.2d 84]; *Gorman* v. *Superior Court* (1937) 23 Cal.App.2d 173, 177-178 [72 P.2d 774]; 1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 290, p. 830.)

It is true that the cases cited present various facts and facts quite different from those here involved. The validity of the rule was present in all and is present in the instant case. Its general applicability is well illustrated by the facts of this case. Consider the effect of the procedure attempted here. Assume that which we are far from conceding—that Warehouse had a contention possessing arguable merit. If the law can properly allow what occurred here, then we will have at best (1) a half-trial and determination of liability; (2) a transfer to another jurisdiction and a determination of non-liability; (3) an appeal from the determination of liability; (4) an appeal from the determination of non-liability; (5) either a postponement of the issue of damages in the first trial pending the trial and appeal of the second action; or (6) a disregard of the second action with almost infinite time-wasting possibilities.

When, in connection with all this, we consider the crowded condition of the courts, the fact that our entire judicial system is facing sharp criticism for the creaking obsolescence of some of its procedural anachronisms, toleration of the acts attempted here would constitute sheer idiocy.

We have stated above that we are far from conceding that Warehouse ever had a settlement or that its contention possessed even arguable merit.

Many things point to the fact that Warehouse did not even urge the settlement in good faith. We have noted the allegation in its complaint that it had informed the court in the Shasta action of a settlement and that it had been "excused" from further participation in that action. We have also noted that that statement is false; that all the court in the Shasta action had been told was that a *tentative* settlement was being negotiated.

Also we have noted how the court in the Sacramento action was asked to and did find *that all of the defendants* had settled the Shasta action. Had that been done why did not Rust notify the Shasta County trial judge under rule 226, California Rules of Court? That section provides: "Whenever a case set for trial has been settled, the attorneys or parties appearing in person shall immediately notify the court thereof. Failure to do so may be deemed an unlawful interference with the proceedings of the court."

█ Since Warehouse had an opportunity to raise its alleged settlement of the Shasta action No. 37153 and spurned that opportunity until after that court had determined Warehouse's joint tortfeasor liability, its right to raise it now is gone, (1) by waiver, should the Shasta action be affirmed on appeal; (2) by the statute of limitations, should the case be set at large by reversal on appeal.

It is ordered that a peremptory writ shall issue prohibiting the Superior Court of Sacramento County from entering judgment in action No. 192553. Its preliminary injunction heretofore issued is dissolved. Both petitioners shall recover costs from Douglas Guardian Warehouse.

Regan, J., and Bray, J.,* concurred.

A petition for a rehearing was denied February 16, 1971, and the petition of the real party in interest in No. 12594 for a hearing by the Supreme Court was denied March 26, 1971.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.