**Richard & Valerie ADAMS, et al., Plaintiffs,**

**v.**

**CAVANAGH COMMUNITIES CORPORATION, Ed McMahon, Joseph Klein, Zola Klein, Cavanagh Land Sales Corp. and John Sgarlat, Defendants.**

**No. 81 C 7332.**

United States District Court, N.D. Illinois, E.D.

Sept. 2, 1987.

Stephen J. Spitz, Eugene J. Frett, Sperling, Slater & Spitz, Chicago, Ill., for plaintiffs.

Wilber H. Boies, Lawrence Zabinski, McDermott, Will & Emery, Chicago, Ill., Victor Schwartz, Philadelphia, Pa., Steven D. McCormick, Kirkland & Ellis, Richard J. Hoskins, Schiff, Hardin & Waite, Chicago, Ill., Richard S. Kraut, Schiff, Hardin & Waite, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

This seven-count complaint, filed on behalf of over one thousand plaintiffs, alleges that defendants Cavanagh Communities Corp. ("Cavanagh Communities"), Cavanagh Land Sales Corp. ("Cavanagh Land Sales"), Ed McMahon, Joseph and Zola Klein ("the Kleins") and John Sgarlat perpetrated a comprehensive land fraud scheme which defrauded plaintiffs and other investors of millions of dollars. The parties are before the court on defendant Ed McMahon's motion for summary judgment with respect to the claims against him.[1] For the reasons set forth below, the court denies McMahon's motion for summary judgment.

### Factual Allegations

In 1969, Cavanagh Communities acquired approximately 26,000 acres of land in central Florida, and commenced plans for the development of a community entitled Rotonda West. Joseph Klein was the president and largest stockholder of Cavanagh Communities, and one of the main individuals responsible for the promotion and development of the Rotonda West project. Using a model constructed for a defunct project entitled "Rotonda East," the Kleins allegedly began marketing Rotonda West as an investment opportunity which would rapidly appreciate in value. They created seven subdivisions surrounding Rotonda

West which were designed as "suburbs" to the Rotonda West project.

Basically, the plaintiffs allege that the Kleins and Cavanagh Communities induced them to purchase undeveloped lots by misrepresenting the actual value of the property, and the ability of the company to develop and improve the property. Plaintiffs allege that these defendants continually increased the price of Rotonda lots throughout the period of sales in order to deceive plaintiffs into believing that their lots were appreciating in value. The structure of the sales agreement assisted defendants in concealing the value of the unimproved lots from the plaintiffs. The contract, which usually provided for several installment payments over a ten-year period, contained a provision that no purchaser could build on his property until all installments were paid and title was transferred by deed. In addition, until title passed, all purchasers were required to grant Cavanagh Communities a right of first refusal on any resales, and plaintiffs were prohibited from reselling their property without the express permission of Cavanagh Communities. The alleged concealment was facilitated by the fact that approximately ninety-five percent of these sales were made to out-of-state investors who were not likely to visit the property, and were dependent upon information from defendants concerning the development of the property.

Defendant Ed McMahon was appointed as an officer of Cavanagh Communities in 1970, and became the firm's principal sales figure. He narrated several Rotonda sale films, and permitted Cavanagh Communities to use his name and picture on all their promotional materials distributed in Illinois and elsewhere across the country. The contract between McMahon and Cavanagh Communities identified McMahon as a principal spokesman for the project, who would make personal appearances and narrate the sales and promotional films distributed in connection with the Rotonda project. McMahon's compensation included cash payments, a home at Rotonda, Rotonda

---

**1.** The other parties have filed motions for summary judgment based on legal theories distinct from the theory that McMahon advances in this motion. This opinion addresses only the claims asserted by McMahon.

West Cove lots, home furnishings and Cavanagh Communities common stock. Between 1970 and 1974, Cavanagh Communities used McMahon's name, picture and image in virtually all of its sales promotions. Plaintiffs allege that these promotional talks, films and brochures misrepresented McMahon's actual relationship to the project, the condition of the property, and the viability of the proposed development.

In 1973 and 1974, McMahon began receiving letters from disgruntled investors complaining about the fact that the lots had not been improved in accordance with his representations. McMahon contacted Cavanagh Communities and requested that they withdraw his narrated film from its sales promotion scheme. The other defendants agreed to withdraw the promotional film, and paid McMahon an additional $100,000 in exchange for his permission to use his name and image in sales promotions of the development. They continued to use his name and image for approximately six to nine months after this agreement.

By 1975, Cavanagh Communities had agents promoting the Rotonda project in offices located in twenty-seven cities and over sixteen states. The plaintiffs allege that defendants' sales force used false and misleading slides, films, property reports and sales brochures (including the McMahon printed materials) to induce them to invest in the project. These materials promised that the final development, which was to include seven golf courses and club houses, a marina, thirty-two miles of canals, and extensive shopping, commercial and recreational facilities, would be completed by 1977.

Plaintiffs allege that in furtherance of their comprehensive scheme to defraud, the Kleins, Sgarlat and Cavanagh Communities filed inaccurate reports with the Securities and Exchange Commission and with regulatory agencies of twenty-six states. According to plaintiffs, these reports were misleading in that they failed to disclose Cavanagh Communities' lack of permits and approvals, flooding conditions at Rotonda, governmental and environmental restrictions on development, and prohibitive economic factors. This misrepresentation continued up to the filing of the complaint in 1981. At the time this complaint was filed, over ninety-five percent of the lots remained undeveloped and could not be reached by conventional means due to flooding and other environmental hazards. Aside from the development of one "core" community in the project, the defendants have never developed the property in accordance with their original promises; nor have they ever refunded these plaintiffs with any portion of the purchase price.

The plaintiffs' seven-count complaint alleges that defendants' perpetration of this land fraud constitutes a violation of the Interstate Land Sales Full Disclosure Act ("ILSFDA"), 15 U.S.C. § 1701 *et seq.;* the Securities Act of 1933 and the Securities Exchange Act of 1934, 15 U.S.C. § 77(*l*) and § 78(j); the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1964; and common law breach of contract and fraud.

### Motion for Summary Judgment

On a motion for summary judgment, the moving party has the burden of establishing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Cedillo v. International Ass'n of Bridge & Structural Iron Workers,* 603 F.2d 7, 10 (7th Cir.1979). The non-moving party is entitled to all reasonable inferences that can be made in its favor. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). However, a plaintiff may not merely rely on conclusory pleadings to withstand summary judgment. In responding to a motion for summary judgment, he must set forth specific facts in affidavits or otherwise show that there are genuine issues that must be decided at trial. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

McMahon's motion for summary judgment alleges that the plaintiffs executed a covenant not to sue him, thereby relinquishing any claims they might have had against him. He asserts that there is no genuine issue of material fact with respect to this covenant; and therefore, he is entitled to judgment as a matter of law. The terms of this alleged covenant not to sue are set forth in three letters that McMahon received in 1981, which form the crux of his motion for summary judgment.

According to McMahon, representatives of the Rotonda Lot Purchasers Association, Inc. ("RLPA") contacted him in the spring of 1981 to inquire about his knowledge of the alleged fraud perpetrated at Rotonda. They told him that he had been targeted as a potential defendant in a lawsuit against Cavanagh Communities and the Kleins. They also represented that they needed more information about the Cavanagh Communities operations before they could file a lawsuit, and suggested that if McMahon consented to be "interviewed" regarding his knowledge of the Rotonda development, he would not be included as a defendant in the impending lawsuit. McMahon's personal business agent, Lester Blank, notified the RLPA in April of 1981 that McMahon would agree to this arrangement.

The basic terms of the agreement are contained in three separate letters, all dated April 22, 1981. The first letter, typed on RLPA letterhead, provides:

Dear Mr. McMahon:

Mr. Mark P. Binstein, this Association's investigator, has provided us with information and material relating to the previous role of yourself and others concerning Cavanagh Communities Corporation. In addition, Mr. Binstein has informed us of the results of his meeting with yourself, his meeting with Mr. Lester Blank (your representative), and his telephone communications with Mr. Blank. Finally, Mr. Binstein has expressed his professional opinions and conclusions concerning the facts and circumstances of your previous activities performed for Cavanagh Communities.

Based upon Mr. Binstein's information, materials, opinions and conclusions, and further based upon your understanding of our plight and your willingness and agreement to assist the members of this Association, the Board of Directors of this Association has decided that you should not be named as defendant in the lawsuit to be filed by our individual members.

We have informed our attorneys of this decision, and instructed our attorneys to not prepare any Complaint naming you as a defendant. It is our understanding that you will meet with Mr. Binstein on or about May 5, 1981, in Los Angeles, and at such time will, in the presence of a court reporter, make a sworn statement in response to Mr. Binstein's questions and general discussion with you concerning Cavanagh, Rotonda and other related subjects. We also request that you have available for inspection and copying at such meeting any and all materials, agreements and other documents in your possession that relate to Rotonda, Cavanagh and any related persons or entities.

We greatly appreciate your assistance in behalf of the members of this Association. We likewise trust that you appreciate our decision, which decision was made notwithstanding our attorneys' legal advice concerning your possible liability resulting from your role with and statements made in behalf of Cavanagh. Mr. Binstein's convictions concerning your previous role with Cavanagh, coupled with your willingness to assist us, played a major role in our decision. We also considered the adverse effects of our members' lawsuit on your career, and the value of your assistance, and thereby concluded that the interests of our members and yourself could best be served with mutual respect and cooperation.

Please advise Mr. Binstein if there is any change in the date of the meeting with you.

Very truly yours,
(signed)
William Janish, President
With the approval of, and by
the direction of the Board of
Directors

P.S. We have of course requested counsel to accompany Mr. Binstein and assist in the meeting with you.

The second letter, also on RLPA letterhead, was sent by Mark P. Binstein, the RLPA's investigator. It states:

Dear Mr. McMahon:

I spoke to Lester Blank on April 20, 1981, at which time he confirmed your willingness to meet with me and discuss in detail the facts and circumstances concerning Cavanagh, Rotonda and related persons and entities. Mr. Blank further confirmed that we would have a court reporter present, so that the discussion, questions and answers would be transcribed as part of a sworn statement.

During this telephone conversation with Mr. Blank, he requested that I provide you with some agreement concerning the Rotonda Lot Purchasers Association, Inc., and its decision to rely upon your assistance and not cause you to be named as a defendant in any lawsuit to be filed by its membership. In this regard, please be advised that it is not my role to decide who is or is not named as a defendant in any proposed lawsuit. However, based upon my input and your decision to assist the members of the Association, I have been advised by the Rotonda Lot Purchasers Association Board of Directors that they have decided to direct attorneys to not name you as a defendant in any action filed by Association membership. The Board further advised me that they have confirmed such decision in a letter to you.

I therefore look forward to our meeting scheduled for May 5, 1981. I understand that a court reporter will be present to transcribe our discussion, questions and answers. Please arrange to have available all agreements, literature, brochures and other documents in your possession concerning Rotonda, Cavanagh Communities and related persons and entities. I will bring to the meeting certain documents I have collected to aid in directing your attention to various subjects. Of course, you may have Mr. Blank and anyone else present to assist in providing me with all relevant facts during the period of 1969 to the present. I realize the bulk of your information will relate to the period of 1969 through April of 1974.

Thank you for your immediate attention and cooperation. You may rely upon the fact that I will respect and protect your relationship with the Rotonda Association.

Sincerely,
(signed)
Mark P. Binstein

The third letter was sent by the law firm at Fishman, Merrick, Perlman & Nagelberg, P.C., which the RLPA had retained as general counsel. It provides:

Dear Mr. McMahon:

This firm was retained by the Rotonda Lot Purchasers Association, Inc. ("Association") in December, 1980 as general counsel. In such capacity, one of our roles is to advise and assist the Association in the selection of law firms to represent the individual members of the Association in connection with claims arising out of or related to Cavanagh Communities Corporation and other related parties.

Based upon our discussions with the Association and other relevant considerations, the Association has retained the law firm of Sperling, Slater & Spitz to prepare the complaint against Cavanagh Communities Corporation and others in connection with the alleged land fraud in Rotonda, Florida. Sperling, Slater & Spitz may or may not be selected to represent individual lot purchasers once the initial complaint is completed.

Pursuant to correspondence from the Board of Directors of the Association and conditioned upon your willingness to cooperate and assist (including the deliverance of a sworn statement), we have been directed by the Association to insist that any law firm which is selected to represent the individual members of the Association agree, as a condition to selection, that such firm refrain from naming you as a defendant in any litigation filed by the Association and/or its members.

Very truly yours,
(signed)
Charles H. Perlman

CHP/bs

CC: William Janish

McMahon's "interview" took place on May 12, 1981 in Beverly Hills, California, and the transcript of this interview has been submitted in support of his motion for summary judgment. Mr. Janish, Mr. Binstein, and their attorney, Steven Spitz, appeared on behalf of the RLPA. McMahon was accompanied by his business manager, Lester Blank, and Marshall Weinberg, who appeared as McMahon's attorney. According to McMahon, he answered their questions to the best of his ability and, at the conclusion of the interview, Janish, Binstein and Spitz told him that "the matter was over for [him] and that the [interview was] all that [he] would be involved in." McMahon Aff. ¶ 5. McMahon told them that they should contact him in the event they needed more information. They contacted him once in 1981 to inquire whether he had attended a Cavanagh meeting in Silver Springs, Maryland. McMahon told them that he had not attended the meeting; and he had no further contact with these gentlemen until he received a letter from Mr. Binstein in September of 1981, which stated that the agreement between McMahon and the RLPA was "terminated." [2]

McMahon asserts that he complied with the terms set forth in the letters, and that these letters create an enforceable covenant not to sue him in connection with the alleged land fraud at Rotonda. The plaintiffs assert three principal arguments in opposition to McMahon's motion for summary judgment. First, they argue that, even if these letters do create an enforceable covenant not to sue, McMahon cannot rely on the covenant as a defense in this lawsuit; it can only be enforced in a separate breach of contract action. Second, they assert that, because this action was instituted on behalf of *individual* plaintiffs, rather than the RLPA, the alleged

covenant not to sue is not binding on the individual plaintiffs. Finally, they allege that McMahon cannot rely on this covenant because he materially breached his purported agreement with the RLPA.

■ When determining the validity of this covenant not to sue, this court must apply the substantive law of Illinois, including its choice of law precepts. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Illinois, the validity of a release is governed by the law of the jurisdiction where it is given and delivered. *Roman v. Delta Airlines, Inc.,* 441 F.Supp. 1160, 1166 (N.D.Ill.1977). In the present case, the alleged covenant was given and delivered to McMahon in California; and the parties appear to agree that the Illinois courts would apply California law when adjudicating the validity of the covenants given to McMahon.

### Raising the Covenant Not To Sue as a "Defense"

Plaintiffs argue that, even if these letters constitute a valid covenant not to sue, summary judgment is inappropriate because this alleged covenant cannot be interposed as a defense to the main action. Relying on *Pellett v. Sonotone Corp.,* 26 Cal.2d 705, 160 P.2d 783 (1945), plaintiffs assert that McMahon can only enforce this alleged covenant not to sue by bringing a separate action for breach of contract; he cannot assert it as an affirmative defense in this action. In *Pellett,* the plaintiff sued Sonotone and others for negligently leaving materials in his ear while fitting him for a hearing aid. Pellett entered into a settlement with one of the defendants, and Sonotone argued that this settlement constituted a release. Relying on the common law principle that the release of one tortfeasor releases all joint tortfeasors, the trial court directed a verdict in favor of Sonotone and the other remaining defendants.

---

**2.** Although McMahon has not submitted this letter in support of his motion for summary judgment, the plaintiffs do not deny sending it.

On appeal, the plaintiff argued that the document in question was neither a release nor a covenant not to sue, but merely an agreement not to levy execution on the settling defendant's property or to demand payment from him for any portion of the judgment. Before labeling the settlement document at issue, the California Supreme Court discussed two critical distinctions between releases and covenants not to sue at common law. The first distinction addresses the effect of these documents on other tortfeasors, and the second relates to the manner in which the documents may be enforced. The court explained:

> The rule in this state, applied in many cases, is that a release of one joint tortfeasor is a release of all, but that a mere covenant not to sue one joint tortfeasor does not release the others.... [T]he distinction between a release and a covenant not to sue is entirely artificial. As between the parties to the agreement, the final result is the same in both cases, namely, that there is no further recovery from the defendant who makes the settlement, and the difference in the effect as to third parties is based mainly, if not entirely, on the fact that in one case there is an immediate release, whereas in the other there is merely an agreement not to prosecute a suit. The rule regarding a covenant not to sue was apparently adopted as an exception to the strict release rule because the courts desired to modify the latter rule by indirection.

> . . . . .

> A release has been defined as the abandonment, relinquishment or giving up of a right or claim to the person against whom it might have been demanded or enforced and its effect is to extinguish the cause of action; hence it may be pleaded as a defense to the action. A covenant not to sue, on the other hand, is not a present abandonment or relinquishment of the right or claim, but merely an agreement not to enforce an existing cause of action. It does not have the effect of extinguishing the cause of action; and while, in the case of a sole tortfeasor, the covenant may be pleaded as a bar to the action in order to

avoid circuity of action, a covenant not to sue one of several joint tortfeasors may not be so pleaded by the covenantee, who must seek his remedy in an action for breach of the covenant.

*Pellett*, 160 P.2d at 786–787 (citations omitted). After analyzing the terms of the settlement agreement between Pellett and the one defendant, the *Pellett* court concluded that it bore greater similarity to a covenant not to sue than a release. Accordingly, the court held that the document did not release Sonotone from liability for Pellett's injuries, and reversed the directed verdict entered by the trial court. 160 P.2d at 787–788. Thus, although the *Pellett* court recited the common law pleading rule regarding the enforcement of covenants not to sue, the facts of that case did not warrant application or interpretation of the rule.

Plaintiffs argue that *Pellett* applies to this action, and precludes McMahon from raising the covenant not to sue as an affirmative defense in this lawsuit. McMahon argues that the California legislature's abandonment of the harsh rules regarding releases has blurred the technical distinctions between releases and covenants not to sue; and the California courts now permit a covenantee to raise the existence of a covenant not to sue in the main action. In 1957, the California legislature amended its code of civil procedure to add section 877, which specifically addresses releases and covenants not to sue. This section provides:

> Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

> (a) it shall not discharge any other tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of consideration paid for it, whichever is the greater; and

(b) it shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasor.

Cal.Code Ann.Civil Procedure § 877. This section eliminates the strict common law rule that a release of one tortfeasor releases all joint tortfeasors. Following the passage of section 877, a settlement involving a release, dismissal or covenant not to sue produces the same effect on any remaining tortfeasors.

▮ Plaintiffs acknowledge that these documents now have the same effect on other tortfeasors; however, they argue that the rules relating to the use of a covenant as a defense is still recognized and enforced by the California courts. In support of this argument, plaintiffs cite two post-amendment cases, *Thomas v. General Motors*, 13 Cal.App.3d 81, 91 Cal. Rptr. 301 (1970), and *Southern California Edison v. Harnischfeger Corp.*, 99 Cal. App.3d 9, 160 Cal.Rptr. 23 (1979). After reviewing these decisions, the court finds that neither case precludes McMahon from asserting the covenant not to sue as a defense in this action.

In *Thomas*, the plaintiff was injured in an accident at a laundromat. The jury found one defendant (Lamb) guilty of negligence, and absolved the remaining defendants from liability. The plaintiff appealed from the judgment with respect to all the defendants. During the course of the appeal, she settled with Lamb, and executed a covenant not to sue in his favor. The remaining defendants moved to dismiss the appeal, arguing that her settlement with Lamb barred her from seeking relief from them on appeal. They argued that, since section 877 refers only to releases, covenants not to sue and dismissals entered *before* judgment, plaintiff's post-judgment settlement with Lamb operated as a release and discharged them from further liability. The court held that the common law rules regarding releases and covenants not to sue still applied, "except as modified by Section 877." *Thomas*, 13 Cal.App.3d at 86, 91 Cal.Rptr. at 304 (citations omitted). Thus, even if section 877 did not apply to

post-judgment settlements, plaintiff's claims were not subject to dismissal because the settlement with Lamb was achieved through a covenant not to sue and not a release. *Id.*

The plaintiffs in this action argue that *Thomas* indicates that, with the exception of the specific changes set forth in section 877, all common law distinctions between releases and covenants not to sue remain in force. The court disagrees with this interpretation of the *Thomas* decision. Following plaintiffs' argument, if Thomas had executed a covenant not to sue Lamb, and then refused to dismiss him, Lamb's only recourse would be to defend the action, and then file a separate suit on the covenant. The *Thomas* decision sought to ensure fairness to the plaintiff, while encouraging and promoting settlements and finality in litigation. Consistent with these goals, it held that the post judgment covenant not to sue discharged Lamb, but it did not discharge plaintiff's claims against the remaining defendants. The court never addressed the issue of how a covenant not to sue may be raised in an action; however, it specifically noted that the covenant not to sue eliminated any dispute between the plaintiff and Lamb. 13 Cal.App.3d at 86, 91 Cal.Rptr. at 304. Accordingly, the court finds that the *Thomas* decision poses no bar to McMahon's assertion of this covenant as a defense to plaintiff's fraud action.

Plaintiffs' reliance on *Southern California Edison Co. v. Harnischfeger Corp.*, 99 Cal.App.3d 9, 160 Cal.Rptr. 23 (1979), is similarly misplaced. In that case, Edison filed suit against Harnischfeger and six other defendants, including Crane Hoist Engineering and Parts Co., Inc. ("Crane Hoist") for damages stemming from an accident at an electric generating plant. Harnischfeger was dismissed on summary judgment, and Edison appealed. Prior to any decision on appeal, Edison obtained a judgment and entered a covenant not to sue with Crane Hoist, and subsequently assigned its claims against Harnischfeger to Crane Hoist.

Harnischfeger moved to dismiss Edison's appeal on the grounds of mootness. The

court held that, "the covenant not to sue/assignment ... gave Crane Hoist the right to proceed with the appeal from the summary judgment (in the name of Edison) [and], if successful, ... to seek indemnification." In reaching this conclusion, the court noted in dictum that some traditional distinctions between releases and covenants not to sue survive the passage of section 877. It remarked:

> [A] release of a joint tortfeasor ... is a relinquishment of plaintiff's right to sue. It may be negotiated both before or after a judgment has been entered.... The release of one tortfeasor before judgment does not discharge other tortfeasors claimed to be liable for the same tort, but may reduce the claims against them. (Code Civ.Proc., § 877).
>
> A covenant not to sue, like a release, is negotiated. *Unlike the release, plaintiff does not relinquish his right to sue by the covenant but subjects himself to an action for breach of the covenant should he continue suit. (Pellett v. Sonotone* (1945) 26 Cal.2d 705, 711–712, 160 P.2d 783). Whether negotiated before or after judgment, a covenant not to sue affects the joint tortfeasors by reducing the amount of the claim against them.

*Southern California Edison,* 99 Cal. App.3d at 14, 160 Cal.Rptr. at 25–26 (other citations omitted) (emphasis supplied). Relying on these comments, plaintiffs argue that the California courts continue to enforce the common law pleading distinction between covenants not to sue and releases.

The court finds that this argument is not persuasive for two reasons.

First, this decision, like the decision in *Pellett,* does not involve a situation where a covenantee seeks to raise the covenant in the main action. Thus, these comments, which basically parrot the common law discussion in *Pellett,* are mere dictum to the holding and not binding on this court.[3] Second, and more importantly, the court notes that the California courts have routinely allowed covenantees to raise the covenants as a defense, rather than forcing them to defend the present action, and then institute separate action to vindicate their rights under the covenant. For instance, in *Rosenstock v. Rosenstock,* 20 Cal.App.3d 847, 98 Cal.Rptr. 123 (1971), the plaintiff attempted to sue the defendant after they entered a covenant not to sue, and the defendant raised the covenant in an attempt to quash the service of process. The court held that the covenant would not bar service of process, and that "the covenantee's sole remedy is either to plead the covenant as a defense or to sue for damages for its breach.... [T]he defendant [may have] a good defense to plaintiff's suit and ... he may have a good cause of action for a cross-complaint; but he may not by a motion to quash escape the effect of service of process on him." *Rosenstock,* 20 Cal.App.3d at 851, 98 Cal.Rptr. at 125. *See also Ford Motor Co. v. Schultz,* 147 Cal.App.3d 941, 195 Cal.Rptr. 470 (1983) (affirming grant of summary judgment to defendant who entered a covenant not to sue with the plaintiff).[4]

---

**3.** In fact, the court's review of California case-law reveals few cases where this rule was actually applied. The rule was recited in *Pellett,* but the facts of the case did not require its interpretation or application because the existence of the settlement document was raised by a defendant who was not a party to the agreement, and who sought his own dismissal on the grounds that the document was a release, and not a covenant not to sue. *See also Hawber v. Raley,* 92 Cal.App. 701, 268 P. 943 (1928) (rule cited in dicta, but not applied to the case because the document was a release). Although *Sunset Scavenger Corp. v. Oddou,* 11 Cal.App.2d 92, 53 P.2d 188 (1936), seems to imply that a covenantee has to defend a suit, and then file an action for breach of covenant, this decision clearly does not survive the passage of Sections 877 and 877.6 of the California Civil Practice

Act, which contemplate a more streamlined procedure for enforcing judicial settlements. *See infra* note 4.

**4.** This conclusion is supported by the terms of Section 877.6 of the California Code of Civil Procedure, which provides in pertinent part:

(a) *Any party* to an action wherein it is alleged that two or more parties are joint tortfeasors *shall be entitled to a hearing* on the issue of the good faith settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors ...

(b) The issue of *good faith* of a settlement *may be determined by the court* ...

(c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims

In addition the court finds that enforcing the rule suggested by the plaintiffs would undermine the effectiveness of section 877, and conflict with the salutary policy underlying its passage. Section 877 clearly permits a covenantee to raise the covenant as a defense to any cross-complaints for indemnity filed by alleged joint tortfeasors. According to plaintiffs, section 877 only affects a covenantee's relationship with his joint tortfeasors, not the injured party. Thus, plaintiffs would interpret the statute to allow a covenantee to extricate himself from cross-complaints, but to remain in the main action at the whim of a plaintiff, even after the covenantee has bargained for his dismissal. Under plaintiffs' interpretation, the only way a covenantee can assure his dismissal from the lawsuit is if he institutes a separate action for breach of the covenant. Presumably, if he obtains a judgment in that action, he can then assert it against the plaintiffs as grounds for dismissal of the main action.

The California legislature certainly did not intend to encourage such a confusing circuity of action when it enacted section 877. Section 877 reflects the California legislature's "statutory objective of encouraging settlements and assuring them a measure of finality." *Fisher v. Superior Court*, 103 Cal.App.3d 434, 445, 163 Cal. Rptr. 47, 54 (1980). *See also Stambaugh v. Superior Court*, 62 Cal.App.3d 231, 235–36, 132 Cal.Rptr. 843, 845–46 (1976); Roberts, *"The Good Faith" Settlement: An Accommodation of Competing Goals*, 17 Loyola L.Rev. (Calif.) 841, 883–888 (1984). As the *Fisher* court noted, "[a] defendant who, in good faith, settles the plaintiff's case against him is certainly entitled to the benefit of that bargain and is entitled to be free of the expenses of the trial and the hazards of further litigation." *Fisher*, 103 Cal.App.3d at 442, 163 Cal.Rptr. at 53. Thus, "[e]very effort should be made to encourage the amicable and fair resolution of disputes. When needless and time-con-

suming litigation can be avoided, costs for all parties are reduced." *American Bankers Ins. Co. v. Avco-Lycoming Division*, 97 Cal.App.3d 732, 736, 159 Cal.Rptr. 70, 73 (1979). As the *Stambaugh* court emphasized,

> Section 877's intent is clear. Where an alleged tortfeasor, prior to a judicial determination of his liability, in good faith settles the claim against him, he is forever discharged of further obligation to the claimant, and to his joint tortfeasors, by way of contribution or otherwise.... Few things would be better calculated to frustrate th[e] policy [of favoring settlements], and to discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would but lead to further litigation and perhaps further liability.

62 Cal.App.3d at 236, 132 Cal.Rptr. at 846. The procedural roadblocks erected by plaintiffs in an attempt to avoid enforcement of the alleged covenant in this action cannot be reconciled with California's clearly enunciated policy favoring settlements.

In *Nagunst v. Western Union Telegraph Co.*, 76 F.R.D. 631 (D.Kans. 1977), the court was confronted with an argument similar to the argument raised in this case. In that case, the defendants requested joinder of an alleged joint tortfeasor who had executed a covenant not to sue. Relying on *Pellett*, they argued that the covenant did not preclude joinder because the covenantee's remedy was a separate action for breach of the covenant. The court rejected their argument, holding:

> To allow joinder of the covenantee ... would be to nullify part of the consideration the covenantee receives for entering into such an agreement. The covenantee receives not only the assurance that no further claim can be made against him, but also freedom from the expense and inconvenience attendant to participation in a lawsuit. We would be loath to so obstruct this avenue of friendly compro-

---

against the settling tortfeasor for ... contribution or ... indemnity.

(emphasis supplied). Although this section does not specifically address raising covenants as a defense to the main action, its broad language

permitting "any party" to raise the good faith of a settlement reinforces the court's conclusion that McMahon should be permitted to raise the alleged covenant in this lawsuit.

mise of claims; Kansas favors agreements of compromise and settlement entered into intelligently and in good faith. We believe the covenant not to sue should preclude joinder of movant as a party defendant.

*Nagunst,* 76 F.R.D. at 634 (citations omitted). The court finds that the same rationale applies to the present case. The policy of encouraging settlement and compromise underlying the passage of section 877 would be thwarted if this court refused to consider a defense based on a covenant not to sue, thereby forcing a defendant to undergo the expense of litigating a claim he thought that he had settled.

The court concludes that, even if some distinctions between covenants not to sue and releases survive the passage of section 877, the California courts clearly would not endorse the piecemeal litigation suggested by the plaintiffs in this action. *See generally Pacific Electric Railway Co. v. Dewey,* 95 Cal.App.2d 69, 212 P.2d 255, 256–57 (1949); *Shane v. Superior Court,* 160 Cal. App.3d 1237, 1250, 207 Cal.Rptr. 210, 219 (1984); *Halpin v. Superior Court,* 14 Cal. App.3d 530, 546, 92 Cal.Rptr. 329, 340 (1971), *cert. denied,* 404 U.S. 832, 92 S.Ct. 79, 30 L.Ed.2d 62 (1971) (criticizing the institution of a second lawsuit to enforce alleged settlement agreements). In *Halpin,* the court dismissed a second lawsuit filed to enforce an alleged settlement agreement, stating, "[w]hen ... we consider the crowded condition of the courts, the fact that our entire judicial system is facing sharp criticism for the creaking obsolescence of some of its procedural anachronisms, toleration of the acts attempted here would constitute sheer idiocy." *Id.* at 546, 92 Cal.Rptr. at 340. This observation is equally applicable to the procedure that plaintiffs suggest McMahon must follow in order to enforce his alleged settlement agreement. The court concludes that the California courts would neither sanction nor approve of this approach to litigating the validity of a covenant not to sue. The plaintiffs have not cited any recent cases where this rule was actually applied, and the court forced a defendant to institute a separate action to vindicate his rights un-

der the covenant. Accordingly, the court finds that McMahon may raise the alleged covenant not to sue as a defense in this lawsuit.

### Authority of RLPA to Enter Settlement Agreement

Plaintiffs also argue that, even if the court permits McMahon to assert the alleged covenant not to sue, summary judgment is still inappropriate, because the plaintiffs did not authorize the RLPA to enter settlements on their behalf. The RLPA is a not-for-profit corporation organized under the laws of the state of Illinois. Its membership is comprised solely of Rotonda purchasers, and its promotional literature lists a two-fold purpose:

(1) to inform other Rotonda lot purchasers of the association's research and investigation results; and,

(2) to institute a Recovery Action whereby participating Association members will be individually represented by counsel selected by the Association.

Def. Reply, Ex. 2 at 3. This literature also describes the management structure of the RLPA:

The Association held meetings, elected directors and officers, and leased appropriate office space and facilities. We selected an experienced law firm to represent Association members in the proposed land fraud action, and retained separate counsel for the Association. We retained research services which we believe to be the most experienced in this area of interstate land sales. We also retained an accountant to record and audit the Association's financial matters.

*Id.* This promotional material advertised a meeting scheduled for January 31, 1981, and described the basic contours of the RLPA's approach to land fraud litigation. It was signed by John Otten, the President of the RLPA's Board of Directors.

This circular also contained information regarding the contemplated "Recovery Action." It identified the law firm which would represent individual plaintiffs in the lawsuit [Sperling, Slater & Spitz], and the

Fishman, Merrick firm, which the RLPA had retained as its general counsel (Reply Brief Ex. 2, ¶¶ C, D). It also set out the cost for each purchaser who wished to join the RLPA and become a member of the lawsuit filed.[5]

This brochure also describes the manner in which the proposed litigation would be conducted:

> H. *This is not a class action.* Each participating Association member is assured that: (a) *you will be represented individually by counsel retained,* and will receive the appropriate retainer agreement from counsel confirming these terms; (b) *counsel will make no further assessment of any participating member* (except contingent fee as listed in item "(e)" following); (c) *suit will be filed in the name of each participating member,* against Cavanaugh Communities and others; (d) judgment will be demanded for *each* plaintiff in the amounts of all *principal and interest paid* (for property and all assessments), together with the demand for *interest of all such payments made, legal costs* and *punitive and exemplary damages* (including the above-stated treble damages); (e) counsel will be due a contingent fee of no more than 25%, *due only on recovery by judgment or settlement;* (f) in the event settlement offers are made, lot purchasers who are plaintiffs will be notified and advised, and *no such offer may or will be accepted in behalf of any Association member except upon the majority of members' acceptance and approval.*

*Id.* (emphasis in original). Plaintiffs argue that the covenant not to sue is not binding on them, because they did not authorize the RLPA or the Fishman, Merrick firm to compromise their claims against McMahon.

The resolution of this issue turns on an application of the law of agency to the attorney-client relationship. *Blanton v. Woman-Care, Inc.,* 38 Cal.3d 396, 696 P.2d 645, 649 (1985). " '[T]he client as principal is bound by the acts of the attorney-agent within the scope of his actual authority (express or implied) or his apparent or ostensible authority; or by unauthorized acts ratified by the client.' " *Id.,* quoting 1 Witkin, Cal.Procedure (2d Ed. 1970) Attorneys § 107, p. 117 (other citations omitted). The law of California on this agency issue is well established. "An attorney may not surrender any substantive right of a client contrary to his instructions or declared desires, and may not compromise the client's case without the client's knowledge and express consent." *Estate of Falco,* 188 Cal.App.3d 1004, 233 Cal.Rptr. 807, 816 n. 16 (1987) (citations omitted). Thus, an attorney has no implied or ostensible authority to bind a client to a compromise settlement merely on the basis of his employment; he must be specifically authorized to settle his client's claims. *Navrides v. Zu-*

---

**5.** The Recovery Action letter listed the following fees for membership:

> I. Each participating member residing in *Illinois* and *Florida* will pay the Association as follows: (2) if you are *"deeded",* $500, plus $100 additional for each lot deeded or purchased (not deeded) in excess of one (1); or, (b) if you are *not* "deeded", $425 plus $100 for each lot purchased in excess of one (1).
>
> Each participating member residing in states other than Illinois or Florida will pay the Association as follows: (a) if you are *"deeded",* $550 plus $100 for each lot deeded or purchased in excess of one (1); or, (b) if you are *not* "deeded", $475 plus $100 for each lot purchased in excess of one. (Note: The above $50 difference is for additional expenses relating to residents of other states.)
>
> . . . . .
>
> J. All participating Association members may request and receive a refund of all payments made to the Association, if such request is made within a thirty-day period from the date of such payments.
>
> . . . . .
>
> K. The Association plans to retain no more than $40,000 to hold in its account for expenses other than preparation, filing and prosecution of the suit in behalf of members. These funds will be used for Association costs and expenses such as membership meetings, all Rotonda lot purchaser communications, secretarial, accounting, administrative services and Association legal representation. All funds in excess of $40,000 will be paid to the law firm selected by the Association to represent individual members, for litigation costs, fees and expenses; and for investigative and related services.

(Reply, Ex. 2) (emphasis in original).

*rich Insurance Co.,* 5 Cal.3d 698, 97 Cal. Rptr. 309, 488 P.2d 637, 639 n. 1 (1971). *See also Blanton,* 696 P.2d at 650; *Whittier Union High School v. Superior Court,* 66 Cal.App.3d 504, 136 Cal.Rptr. 86 (1977); *Linsk v. Linsk,* 70 Cal.2d 272, 74 Cal.Rptr. 544, 449 P.2d 760 (1969); *Bice v. Stevens,* 160 Cal.App.2d 222, 325 P.2d 244 (1958).

In *Blanton,* the plaintiff's attorney entered into an arbitration agreement, and the plaintiff's action against one defendant was dismissed. The plaintiff sought to set aside the dismissal on the grounds that the arbitration agreement and subsequent dismissal were unauthorized. The California Supreme Court explained the general principles surrounding the authority of an attorney to bind his client:

> An attorney retained to represent a client in litigation is clothed with certain authority by reason of that relationship.... In retaining counsel for the prosecution or defense of a suit, the right to do many acts in respect to the cause is embraced as ancillary, or incidental to the general authority conferred, and among these is included the authority to enter into stipulations and agreements in all matters of procedure during the progress of the trial....
>
> The authority thus conferred upon an attorney is in part apparent authority— i.e., the authority to do that which attorneys are normally authorized to do in the course of litigation manifested by the client's act of hiring an attorney—and in part actual authority implied in law....
>
> An attorney must be able to make ... tactical decisions[, and in these] tactical matters, it may be said that the attorney's authority is implied in law, as a necessary incident to the function he is engaged to perform.
>
> An attorney is not authorized, however, merely by virtue of his retention in litigation, to 'impair the client's substantive rights or the cause of action itself.' *Linsk v. Linsk,* 70 Cal.2d 272 [74 Cal. Rptr. 544], 449 P.2d 760 (1969). ... [Decisions involving compromise or settlement] differ from the routine and tactical decisions which have been called 'procedural' both in the degree to which they

affect the client's interest; and in the degree to which they involve matters of judgment which extend beyond technical competence so that any client would be expected to share in the making of them.

*Blanton,* 696 P.2d at 650–51 (other citations omitted). The court concluded that, if the agreement at issue involves "a substantial matter such as compromise of an action, 'a person dealing with an attorney, as dealing with any agent, must ascertain whether the agent has the authority to do the purported act and assumes the risk if in fact the agent has no such authority.'" *Blanton,* 696 F.2d at 652, quoting *McKeague v. Freitas,* 40 Haw. 108, 113 (1953). Applying these principles to the case before it, the *Blanton* court held that plaintiff's counsel had no authority to enter the agreement to arbitrate; and the arbitration agreement was not binding on the plaintiff. *Blanton,* 696 P.2d at 652–53.

■ As the *Blanton* case illustrates, the California courts will set aside settlements and dismissals which were not authorized by the plaintiff. *See generally Whittier Union High School v. Superior Court,* 66 Cal.App.3d 504, 136 Cal.Rptr. 86 (1977) (setting aside unauthorized voluntary dismissal); *Linsk v. Linsk,* 70 Cal.2d 272, 449 P.2d 760 (1969) (setting aside stipulation entered over the client's objection); *Bice v. Stevens,* 160 Cal.App.2d 222, 325 P.2d 244 (1958) (vacating unauthorized dismissal of a defendant); *Bowden v. Green,* 128 Cal. App.3d 65, 180 Cal.Rptr. 90 (1982) (vacating unauthorized dismissal of a cross-complaint). *Cf. Ackerman v. Ackerman,* 517 F.Supp. 614 (S.D.N.Y.1981), *aff'd,* 676 F.2d 898 (2d Cir.1982) (discussing California law on this issue). The foregoing cases establish that this rule regarding an attorney's authority to compromise a claim clearly applies to the alleged covenants not to sue that the RLPA and the Fishman, Merrick firm executed in favor of McMahon. There is no evidence on record that the named plaintiffs voted on this compromise of their claims against McMahon. The terms of the Recovery Action letter indicate that neither the RLPA nor the Fishman, Merrick law firm was authorized to settle any claims in

a manner other than that provided by the agreement between plaintiffs and the RLPA. Because the record does not disclose whether the proper procedures were followed, the court cannot determine whether summary judgment on the basis of the alleged covenant would be appropriate. The parties have submitted conflicting accounts regarding the authority of the RLPA and its counsel, and the assurances that they gave McMahon. These submissions raise a genuine issue of material fact regarding the actual authority of the covenantors, which precludes summary judgment on the basis of the RLPA's actual authority to enter these covenants.

McMahon also argues that plaintiffs may be bound to the covenant through the theory of implied or ostensible authority; and the court may grant summary judgment on this theory. This type of authority arises as a result of conduct by the principal which causes a third party to reasonably believe that the agent possesses the authority to act for the principal. *Tomerlin v. Canadian Indemnity Co.*, 61 Cal.2d 638, 39 Cal.Rptr. 731, 394 P.2d 571, 574 (1964). "If a principal le[ads] others to believe that he conferred authority on an agent, he cannot be heard to assert, as against others who have relied thereon, that he did not intend to confer such power." *Tomerlin*, 39 Cal.Rptr. 731, 394 P.2d at 575.

The decisions discussing actual authority in the context of settlement of a plaintiff's claim seem to indicate that theories of implied authority will not bind the plaintiff to a settlement. *See Blanton*, 696 P.2d at 650; *Navrides*, 97 Cal.Rptr. 309, 488 P.2d at 637, 639 n. 1; *Bice*, 325 P.2d at 250–51.[6] Even if the theory of implied authority can be applied in this context, however, it is clear that the issue of implied authority cannot be resolved on a motion for summary judgment. Implied authority is predicated on a third party's reliance on the representations of the principal with regard to his agents. In the present case, McMahon argues that he relied on the individual plaintiffs' delegation of authority to the RLPA and its counsel to conduct this lawsuit; and the nature of plaintiffs' agreement with the RLPA indicates that the corporation and its attorneys were authorized to compromise plaintiffs' claims against McMahon. Plaintiffs argue that McMahon cannot cite their relationship with the RLPA as a basis for any alleged reliance because he knew that the Association had no authority to compromise individual claims before he entered the covenant not to sue. They assert that McMahon's business agent, Lester Blank, attended two RLPA meetings in which the powers of the corporation were discussed in detail. *See* Janish Aff. ¶¶ 3, 4, 6; Binstein Aff. ¶¶ 3, 4, 5. The meeting specifically explained the *only* manner in which a settlement of individual claims could be achieved. The court finds that the parties' dispute on this reliance issue, as well as the other issues relating to the assurances given McMahon, and the authority for these assurances, creates genuine issues of material fact which cannot be resolved on a motion for summary judgment.

## Conclusion

For the reasons set forth above, the court finds that, although McMahon may raise a covenant not to sue as a defense,[7] genuine issues of material fact preclude summary judgment based on these doc-

---

6. The court notes that the Illinois courts follow the same rules when confronted with an unauthorized settlement of a plaintiff's claim. *See Knisley v. City of Jacksonville*, 147 Ill.App.3d 116, 100 Ill.Dec. 705, 497 N.E.2d 883 (1986), *app. denied*, 113 Ill.2d 575, 106 Ill.Dec. 47, 505 N.E.2d 353 (1987); *Burton by Burton v. Estrada*, 149 Ill.App.3d 965, 103 Ill.Dec. 233, 501 N.E.2d 254 (1986), and cases cited therein. Like the present action, the *Knisley* decision involved a large group of plaintiffs who agreed that no settlement would be entered without the consent of the majority. The appellate court held that this provision was ineffective to dismiss the claims of the minority objectors. The decision calls into question the validity of the provision in the Recovery Action letter that settlement of the claims could be obtained through a majority vote of the RLPA members.

7. This decision does not foreclose McMahon from seeking affirmative relief from the parties who entered into these covenants and gave him their assurances that he would not be sued.

uments. Accordingly, the court denies McMahon's motion for summary judgment.